Name  Reuven L. Cohen

Address  724 S. Spring St., 9th Floor

City, State, Zip  Los Angeles, CA 90014

Phone  (213) 232-5160

Fax  (213) 232-5167

E-Mail  rcohen@cohen-williams.com

☐ FPD   ☒ Appointed   ☒ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Juan Carlos Seresi | CASE NUMBER: |
| | 2:15-cv-04856-SVW |
| PLAINTIFF(S), | 2:89-cr-00190-SVW |
| v. | |
| United States of America | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____ Juan Carlos Seresi _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
    Denying Motion to Correct or Reduce
    Sentence under 28 U.S.C. § 2255 (Dkt. 11)

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on ____August 10, 2020____ . Entered on the docket in this action on __August 10. 2020__ .

A copy of said judgment or order is attached hereto.

____08/19/2020____          /s/ Reuven L. Cohen
Date                          Signature
                              ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# JS-6

## CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

Present: The Honorable:    STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

Attorneys Present for Plaintiffs:       Attorneys Present for Defendants:

N/A                    N/A

**Proceedings:  IN CHAMBERS ORDER DENYING DEFENDANTS' MOTIONS TO
CORRECT OR REDUCE AN ILLEGAL SENTENCE UNDER 28 U.S.C. § 2255 [1248]
[1275] [1313] [1315]**

**Proceedings:** Before the Court are four petitions under 28 U.S.C. § 2255 ("§ 2255") to vacate or
set aside criminal convictions. The Defendants are: Vahe Andonian ("Vahe"), Nazareth
Andonian ("Nazareth") (together "Andonians"), Juan Carlos Seresi ("Seresi"), and Raul Vivas
("Vivas"). All together, they are referred to as the "Defendants," both on the current motion and
in the previous criminal trial. The criminal case was brought in 1989 by the United States
Department of Justice, *USA v. Andonian et al.*, 89-CR-190-SVW (C.D. Cal. 1989),[1] and resulted
in the conviction of all four Defendants. For the purposes of this Order, the United States
prosecutors involved the instant case will be referred to as the "Government," and all other

---

[1] All four petitions were assigned to this Court between 2015–2106, but the original case, including the criminal
trial, was presided over by the Hon. William D. Keller, referred to hereafter as the "Trial Court."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:17-cv-09316-SVW                    Date: August 10, 2020
           2:17-cv-09315-SVW
           2:13-cv-04928-SVW
           2:15-cv-04856-SVW
           2:89-cr-00190-SVW

Title      Vahe Andonian v. United States of America
           Nazareth Andonian v. United States of America
           Raul Vivas v. United States of America
           Juan Carlos Seresi v. United States of America
           USA v. Andonian et al

references to prosecutors (including the previous criminal trial) will utilize the terms
"prosecutors," "government," or "executive." After the initial exhaustion of their direct appeals
and collateral attacks, Defendants have each been granted permission from the Ninth Circuit to
file successive § 2255 petitions, all of which have been duly filed. The Government has not
opposed any motion. Under 28 U.S.C. § 2255, the Court must "determine the issues and make
findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "If the court
finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not
authorized by law or otherwise open to collateral attack, the court shall vacate the judgment . . .
." *Id.* For the reasons set forth below, the petitions are DENIED.

## I.      Procedural Background

In 1989, federal prosecutors charged Vahe Andonian, Nazareth Andonian, Raul Vivas,
and Juan Carlos Seresi, among several others, with 1) conspiring to aid and abet the sale of
cocaine, 2) conspiring to launder the proceeds of drug sales, and 3) multiple acts of money
laundering and conspiracy to commit thereto. This is referred to as the "Andonian Conspiracy."
After eight months of trial and over four weeks of deliberation, the jury returned a mixed verdict,
finding Defendants guilty on charges of money laundering and conspiracy, but acquitting all
drug charges. Defendants were sentenced to 505 years in prison and substantial monetary
penalties. The Ninth Circuit affirmed the convictions in a memorandum opinion. *See United
States v. Andonian*, 29 F.3d 634 (Mem.) (9th Cir. 1994).[2]

---

[2] The Ninth Circuit described the trial verdict as follows: "Raul Vivas, Juan Carlos Seresi, Ruben Saini, and Vahe
and Nazareth Andonian were convicted on Count 2, which alleged conspiracy to launder money. Vivas, Seresi, and
the Andonians were also convicted of individual acts of money laundering alleged in Counts 3–27. . . None of the
defendants were convicted on Count 1, which alleged conspiracy to aid and abet the possession and distribution of
cocaine, in violation of 21 U.S.C. §§ 841, 846 and 18 U.S.C. § 2."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:17-cv-09316-SVW                    Date: August 10, 2020
             2:17-cv-09315-SVW
             2:13-cv-04928-SVW
             2:15-cv-04856-SVW
             2:89-cr-00190-SVW

Title      Vahe Andonian v. United States of America
          Nazareth Andonian v. United States of America
          Raul Vivas v. United States of America
          Juan Carlos Seresi v. United States of America
          USA v. Andonian et al

      a.  **Direct Appeals and Collateral Attacks**

      In their direct appeal to the Ninth Circuit, Defendants presented a Combined Statement of Facts ("DCSF"), which explained the role each Defendant played in the alleged conspiracy.[3] Dkt. 1348-1. Upon request of the Court, these briefs were submitted in this proceeding, as well as substantial portions of the criminal trial transcript, which the Court has now thoroughly reviewed.[4]

      During the criminal trial, the Trial Court allowed some evidence from a separate indictment, the "Koyomejian Conspiracy," be introduced under Federal Rule of Evidence 404(b) against Defendants Vivas, Seresi, and Reuben Saini (who has already been released, and is not a party to the present § 2255 motions). DCSF, Dkt. 1348-1 at 5–8, 28–31. The Koyomejian Conspiracy was a precursor to Andonian Conspiracy, which overlapped in time somewhat and involved a similar *modus operandi*. Although it involved some of the same defendants,[5] the Koyomejian Conspiracy was an independent case brought before U.S. District Judge Marshall, also in the Central District of California. Several defendants in the Koyomejian Conspiracy, including Sergio Hochman ("Hochman") and Richard Ferris ("Ferris"), offered 404(b) testimony

---

[3] The parts of DCSF recounted in this Order have been substantially confirmed by this Court's review of the trial record.

[4] As discussed in more detail below, the transcript of the criminal trial was only recently made fully available to the Court. Relevant portions of the trial record were first provided to the Court on November 27, 2019. Although exaction citations are not feasible to a trial record that spanned eight months and is over 30 years old, the Court will refer to the trial record by the name of the witness (or party when argument is cited), the date of the testimony, the approximate page range based on trial transcript documents provided to the Court on November 27, 2019. *Example*: Hochman, Jun. 5, 1990 at 1570–75.

[5] Raul Vivas, Carlos Desoretz, and Richard Ferris were defendants in both the Andonian and Koyomejian Conspiracies. Their roles in the Andonian Conspiracy are discussed in more detail below. For more information on the Koyomejian Conspiracy, see Henry Weinstein, *Eight Plead Guilty to Money Laundering*, Los Angeles Times, Oct. 2, 1993, https://www.latimes.com/archives/la-xpm-1993-10-02-me-41377-story.html.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

regarding the Koyomejian Conspiracy in the Andonian trial. *Id.* at 8–10. In all, the government utilized five cooperating witnesses at the Andonian trial, but only Sergio Hochman, Mario Tankazyan ("Mario"), and Richard Ferris, discussed below, offered significant evidence directly against the Andonians.[6]

The inclusion of this 404(b) evidence from the Koyomejian Conspiracy in the Andonian trial formed the primary basis for Defendants' direct appeal to the Ninth Circuit. In their appellate briefs, Defendants argued the Trial Court had erred by allowing testimony from the Koyomejian Conspiracy as 404(b) evidence. *Andonian*, 29 F.3d 634 (Mem.), at *3. The evidence was offered only against Vivas, Seresi, and Rueben Saini, and the Ninth Circuit affirmed the Trial Court's decision to admit the testimony, holding "[t]he evidence tends to show both knowledge and intent, which are elements of money laundering. The evidence of Vivas', Seresi's, and Saini's prior relationship also tends to establish the association and plan elements of conspiracy." *Id.* at *3.

The Ninth Circuit further concluded that the 404(b) evidence was not prejudicial as to any Defendant, and "the decision to charge the Andonian conspiracy separately from the Koyomejian conspiracy [was] supported by the record." *Id.* at *5. The Trial Court consistently cautioned the jury to cabin the 404(b) evidence, (*see, e.g.*, Hochman, Jun. 5, 1990 at 1578–83), and Ninth Circuit affirmed the Trial Court's handling of the evidence. *Andonian*, 29 F.3d 634 (Mem.), at *6. The Ninth Circuit "reject[ed] the assertion that the jury failed to compartmentalize," and held that "[t]he district court instructed the jury as to the limited

---

[6] "The 5 cooperating witnesses were Sergio Hochman, a defendant in the Koyomejian case and an unindicted co-conspirator in the Andonian case; Manouk Demirjian, a defendant in the Koyomejian case and an unindicted co-conspirator in the Andonian case; Carlos Desoretz, a defendant in both the Koyomejian and Andonian indictments; Richard Ferris, a defendant in both the Koyomejian and Andonian indictments; and Vagram Mario Tankazyan, a defendant in the Andonian case only." DCSF, Dkt. 1348-1 at 8.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

admissibility of certain evidence. The jury returned selective verdicts indicating that it found different levels of intent with respect to Vivas and Seresi and acquitting four other defendants." *Id*. Finally, the Ninth Circuit concluded the 404(b) evidence did not dominate the Andonian Conspiracy evidence on the record, which was sufficient to support a conviction under the indictment. *See id*. ("Although the evidence of other crimes and acts contributed to the government's case that Vivas, Seresi, and Saini were members of a conspiracy, it did not rise to the level of altering the conspiracy charged in the indictment."). After the Supreme Court denied certiorari of the appeal, Defendants pursued habeas remedies in federal court, which were all unsuccessful. *See* Dkt. 1350 at 4 (recounting the procedural history of Defendants' appeals and collateral attacks).

**b. Present § 2255 Motions**

On July 18, 2012, Sergio Hochman executed a sworn declaration attesting to undisclosed benefits he received from the government before and during the criminal trial. *See* Hochman Decl., Dkt. 1315, Exh. A. Hochman admitted that FBI agents provided the following benefits:

A. Hochman was allowed to speak to his wife without restraints in the back of a government vehicle for a period of several minutes.
B. On another occasion, Hochman was permitted to visit his wife in their apartment, and was left alone with her in a separate room, at which time they "did show affection to each other." *Id.* The parties agree this amounted to a conjugal visit.
C. Another time, Hochman was permitted to ride with his wife in the back of a government vehicle unrestrained.
D. Finally, either before or after trial, Hochman was taken to lunch by FBI agents at a restaurant in Malibu.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.    2:17-cv-09316-SVW                     Date: August 10, 2020
             2:17-cv-09315-SVW
             2:13-cv-04928-SVW
             2:15-cv-04856-SVW
             2:89-cr-00190-SVW

Title       Vahe Andonian v. United States of America
            Nazareth Andonian v. United States of America
            Raul Vivas v. United States of America
            Juan Carlos Seresi v. United States of America
            USA v. Andonian et al

*Id.* Hochman declared that the government agents at the time told him not to disclose these benefits to anyone. *Id.* At the criminal trial, Hochman fully disclosed the benefits he received regarding the reduction of his criminal liability, but he did not testify as to the four personal benefits listed above. Defendants argue this failure to disclose amounts to a constitutional violation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("*Brady*") and *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("*Giglio*").[7]

Based on the newly disclosed evidence of Sergio Hochman, all Defendants were granted permission to and did file successive § 2255 motions. *See* Dkt. 1313 (Nazareth); Dkt. 1315 (Vahe); Dkt. 1248 (Vivas); Dkt. 1275 (Seresi). Seresi and Vivas have also joined the Andonians § 2255 motions and provided some supplemental briefing explaining the joinder, but with no specific discussion of the factual record or how their case differs from the Andonians.[8] The government has filed a non-opposition to all four motions, which are now before the Court. Dkt. 1338.

Since acquiring the cases in 2016, this Court has expended substantial resources in attempting to resolve the present motions. At an early status conference in July of 2019, the Government offered no opposition to Defendants' motions, but also appeared to have no substantive knowledge of the underlying case. The Government was unable to answer basic questions about the case's procedural and factual history, and had no experience with the transcript of the criminal trial. In fact, the Government represented to the Court that no transcript existed. Similarly, Defendants did not provide any analysis of the trial record, but instead relied

---

[7] For simplicity, this type of constitutional claim is referred to hereinafter as a *Brady* violation.
[8] Neither Vivas nor Seresi provided any discussion of the factual record, and appear to rely on the Government's non-opposition and the Andonians' arguments. As explained further below, their motions are considered with the Andonians motions herein.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

on the Government's non-opposition and legal argument. The Court ordered a supplemental explanation of the Government's non-opposition, which was delivered on July 29, 2019. Dkt. 1345. After reviewing the Government's supplemental non-opposition, the Court ordered the parties to deliver the briefs from the direct appeal to the Ninth Circuit. Dkt. 1348. In the subsequent hearing on the motion on November 25, 2019, Defendants represented to the Court that digital scans of the trial transcript were available. The Court ordered the lodging of all transcripts related to the closing arguments of all parties, the testimony of Sergio Hochman, the testimony of Vahe Andonian, and the testimony of Mario Tankazyan, all of which amounted to several thousand pages. These transcripts were delivered to the Court on November 26, 2019, and the Court thoroughly reviewed them. In the interim, the Court further requested a complete record of the trial from the Court's own archives, which contained eighteen full boxes of trial evidence and court records. Dkt. 1360.

Despite the Court's continued requests for guidance, no party has offered a thorough examination of how Hochman's testimony fit into the overall evidentiary record presented against Defendants. Although the parties have regularly characterized Hochman's testimony as "substantial," (dkt. 135 at 2), or "critical," (dkt. 1358 at 9), they have neglected to address the vast array of testimonial, documentary, and circumstantial evidence presented at trial that was independent of Hochman, or that was corroborated by documentary evidence and other cooperating witnesses.[9] To date, neither the Government nor any Defendant has provided a detailed analysis of the trial record to the Court. Although Vahe Andonian's supplemental memorandum from December 5, 2019, (dkt. 1358), does address the initial facts of the conspiracy, it merely "summarized" how Hochman's testimony affected Vahe Andonian. In fact,

---

[9] The parties have also mentioned that the testimony of the government agent who provided these benefits to Hochman may have been impeached, but there has been no argument on the point. Regardless, the Court does not rely on the evidence of any FBI agent to reach its conclusion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

the memorandum seems to emphasize how little Hochman contributed to the case against Vahe, noting "Sergio Hochman never met with or spoke to either Andonian brother." Dkt. 1358 at 7. Defendant argues "Hochman's testimony hurt the Andonians not so much by what he said, but rather what he didn't say." *Id.* However, as explained by the discussion of the evidentiary record below, every aspect of the Andonian conspiracy was attested to by multiple witnesses, and supported by ample documentary and physical evidence.

In the final hearing on January 26, 2020, attorneys for all four Defendants were present and given the opportunity to individually decide if they wished to offer further briefing on behalf of their clients. *See* Dkt. 1371. All Defendants declined to provide further briefing, and relied on the submitted papers and arguments. *Id.* Accordingly, as is its duty, the Court has undertaken a thorough review of the trial record. The Court has examined thousands of pages of trial transcripts, reviewed trial briefs, and even procured original documentary evidence stored in the Court's archives. *See* Dkt. 1360. As explained further by the discussion of evidentiary record below, all Defendants have failed to carry their burden under *Brady* to show that the impeachment evidence regarding Sergio Hochman that was withheld from Defendants was prejudicial to the criminal trial.

**II. Overview**

The Andonian Conspiracy alleged a money laundering scheme, originally devised by Vivas and Hochman while in Uruguay, whereby proceeds from drugs sold on the streets of New York City, Los Angeles, and Miami could be laundered back to South America. DCSF, Dkt. 1348-1 at 5. According to prosecutors, the conspirators would sell illegal drugs in various cities across the United States, which would produce millions of dollars in cash. The cash would be collected by street-level operatives, who would then deliver it in bags of small denomination currency to representatives of the United States-based arm

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:17-cv-09316-SVW  Date: August 10, 2020
2:17-cv-09315-SVW
2:13-cv-04928-SVW
2:15-cv-04856-SVW
2:89-cr-00190-SVW

Title  Vahe Andonian v. United States of America
Nazareth Andonian v. United States of America
Raul Vivas v. United States of America
Juan Carlos Seresi v. United States of America
USA v. Andonian et al

of Vivas's operation, ROAF.[10] DCSF, Dkt 1348-1 at 5. Both Hochman and Seresi were key employees of ROAF, and Hochman ran the New York Office for the majority of the conspiracy. Dkt. 1358 at 6. Although prosecutors brought charges related to the distribution of cocaine, there was no direct evidence of drugs introduced in the Andonian trial, and jury did not convict any Defendant on drug charges. Rather, all Defendants were convicted because of their role in the money laundering conspiracy.

The operations of the money laundering conspiracy were testified to extensively at trial by Mario, Hochman, and Richard Ferris.[11] The specific mechanisms of the scheme are discussed in more detail below, but can be briefly be summarized as follows. To launder the cash, ROAF would buy millions of dollars of fine gold. In order for the scheme to work, ROAF needed a stable supply of large amounts gold. The Andonians were established gold brokers in the Los Angeles jewelry mart, and they owned a company called Andonian Brothers Manufacturing, Inc. ("ABI"). DCSF, Dkt. 1348-1 at 10. The Andonians, through ABI, had an existing relationship with A-Mark, a large gold dealer on the West Coast. [12] Mario was a gold dealer in Los Angeles who ran a company called Rose Marie, Inc. ("Rose Marie"), and Mario acted as an intermediary between ROAF and the Andonians. DCSF, Dkt 1348-1 at 12. Mario and ROAF needed the Andonians to buy gold from A-Mark because A-Mark did not have an existing relationship with ROAF or Mario, and would not deal with them directly. *Id.* at 32. Using cash provided by ROAF (through Mario), the Andonians would purchase large amounts of fine gold from A-Mark. The

[10] The company used for cash collection in the United States changed names several times throughout the years of the Andonian Conspiracy, but is generally referred to here as ROAF. Similarly, the "bank" in Uruguay that Vivas used to receive funds is referred to as "Letra" or "Cambo de Italia," although that name also changed throughout the course of the conspiracy. DCSF, Dkt. 1348-1 at 14–16.

[11] Richard Ferris was the president of Ronel Refining, Inc., and he entered guilty pleas in both the Koyomejian and Andonian Conspiracies. DCSF, Dkt. 1348-1 at 24.

[12] According to Defendants, A-Mark was the largest gold dealer on the West Coast, handling between $5–$10 million per day in gold transactions. DCSF, Dkt. 1348-1 at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.     2:17-cv-09316-SVW                                   Date: August 10, 2020
             2:17-cv-09315-SVW
             2:13-cv-04928-SVW
             2:15-cv-04856-SVW
             2:89-cr-00190-SVW

Title     Vahe Andonian v. United States of America
          Nazareth Andonian v. United States of America
          Raul Vivas v. United States of America
          Juan Carlos Seresi v. United States of America
          USA v. Andonian et al

purchased gold would then be sold to a precious metal refinery in Florida, Ronel Refining, Inc.
("Ronel"), who then immediately resold the gold to A-Mark at a loss. Ronel would credit the
proceeds of the sale to Letra, Vivas's "bank" in South America, completing the circular
transaction.

　　　Ferris, Hochman, and Mario cooperated with the government, and explained the
mechanism of the Andonian Conspiracy in detail at the criminal trial. By conservative estimates,
in the course of roughly one year, the Andonian conspiracy laundered over $300 million in
illegal funds from the United States to South America. Dkt. 1345 at 2.

### a.　Money Laundering Via Physical Gold Transactions

　　　The process of turning the cash into gold occurred via two methods: at first via the
physical delivery of gold, and second via account-only transactions known as "pools." DCSF,
Dkt. 1348-1 at 15.  In the first phase of physical gold delivery, ROAF procured gold from the
Koyomejians and various other small gold dealers. "The gold was then sent to Miami by
overnight courier, where it was sold to Ronel Refining. The proceeds from the sale were then
sent by Ronel to various banks in South America." DCSF, Dkt. 1348-1 at 9.  Richard Ferris, the
president of Ronel Refining, explained this process at the trial. *Id.* at 27. Ferris testified that
Ronel first began to buy scrap gold from ROAF in 1986 and continued to work with ROAF until
the conspiracy ended in 1989. *Id.* at 27.

　　　At first, ROAF relied primarily on the Koyomejians to procure the gold. However, when
the Koyomejian relationship soured, ROAF looked for new sources. When Hochman could not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

find a consistent source of fine gold in New York City,[13] Vivas recommended switching to a new connection in the Los Angeles jewelry mart. Mario had recently met the Andonians (ABI) who, as described above, had an existing relationship with A-Mark. Vivas instructed Hochman and Mario to use ABI to purchase gold going forward. DCSF, Dkt. 1348-1 at 10. The Andonians had developed a relationship with A-Mark by purchasing gold for their jewelry business, and acting a gold broker for smaller jewelers in the Los Angeles jewelry mart. *Id.* at 31. Before they began working with Mario/ROAF, the Andonian brothers were already buying roughly $100 million in gold from A-Mark per year for themselves and other clients in the jewelry mart. DCSF, Dkt. 1348-1 at 32. In the one year they worked with ROAF, the Andonians did over $300 million in purchases almost exclusively for ROAF through Rose Marie (via Mario). Dkt. 1350 at 2.

Mario, Ferris, and Hochman all testified to the operation of the Andonian Conspiracy. However, despite running the ROAF office in New York City, Hochman had no direct contact with the Andonians. *Id.* Instead, Mario would act as the conduit between ROAF and ABI. As described by Defendants in their briefs to the Ninth Circuit:

> In the typical transaction, appellant Juan Carlos Seresi would call Mario from the RAOF offices and tell Mario how much gold RAOF desired to purchase that day. Mario would then call ABI, tell them how much gold Rose Marie wanted to purchase, and then someone from ABI would either pick up the money for the purchase, or the money would be delivered to ABI. After ABI obtained the gold from its own sources, the gold would be delivered to Rose Marie or RAOF.

---

[13] Despite Defendants' argument that cash was the common practice in the gold industry, Hochman was unable to find gold dealers in New York City who would accept such large volumes of cash for fine gold on a regular basis. USA Rebuttal, Nov. 29, 1990 at 19626.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

DCSF, Dkt. 1348-1 at 15 (internal citation omitted). The Andonians would receive the cash via an armored courier, either Brinks or Loomis, and use that cash to purchase gold from A-Mark. *Id.* at 10. However, this method still required ROAF to deliver physical gold to Ronel, which was expensive and risked the delivery of sub-standard gold. *Id.* at 22. Subsequently, "pool accounts" were created to execute the transactions. *Id.* at 10.

### b. **Money Laundering Via "Pool Accounts"**

"In late 1987, a pool account was set up for gold trading between ABI and Rose Marie." DCSF, Dkt. 1348-1 at 15 (internal quotation marks omitted). In a pool account, "there is no physical delivery of the commodity being traded. Rather, debits and credits to the accounts of the various traders are maintained. While the transactions are occurring on paper, all transactions in the pool are backed by the promise to deliver actual kilogram bars of fine gold." *Id.* at 15 n.9. The first pool was established at a commodities trading house called Proseguer. *Id.* at 16. In brief, a typical pool transaction would flow as follows: cash would be collected by street operatives and delivered to ROAF; then ROAF (usually via Seresi) would instruct Mario how much gold to purchase for that day. Mario would in turn relay that information to ABI, and the Andonians would then make a pool purchase for gold from A-Mark and instruct A-Mark to credit the gold to a depository account at Proseguer. "In every instance of the pool account trading, these deposits were to the account of Ronel Refining, Inc., which in turn credited the deposits to a numbered account belonging to a company or organization named Letra." *Id.* After receiving credit for the gold they purchased from A-Mark, Ronel would immediately sell the same amount of gold back to A-Mark at a loss via the pool—effectively turning cash into gold into bank deposits—all without any physical gold ever changing hands. *Id.* Eventually the A-Mark pool was shut down, and the Andonians tried a similar scheme with Phillip

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:17-cv-09316-SVW                                    Date: August 10, 2020
            2:17-cv-09315-SVW
            2:13-cv-04928-SVW
            2:15-cv-04856-SVW
            2:89-cr-00190-SVW

Title       Vahe Andonian v. United States of America
            Nazareth Andonian v. United States of America
            Raul Vivas v. United States of America
            Juan Carlos Seresi v. United States of America
            USA v. Andonian et al

Brothers in London. *Id.* at 23. However, the pool was short-lived, as it only began in late 1988, and the charges in the Andonian case were filed early 1989. *Id.*

### III.    Legal Standard

#### a.    28 U.S.C. § 2255

Under 28 U.S.C. § 2255, the court must "determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, the court shall vacate the judgment . . . ." *Id.* Pursuant to 28 U.S.C. § 2255(h), before undergoing scrutiny by a district court pursuant to § 2255(b), a second or successive petition must be certified by a panel of the appropriate court of appeals to contain "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense . . . ." 28 U.S.C. § 2255(h). When the court of appeals certifies a petition based on this standard, the court of appeals is holding that the facts make prima facie showing that the motion should be granted. *Adams v. United States*, 583 Fed. App'x 658 (Mem.), 659 (9th Cir. 2014). "A prima facie showing means a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Id.* (internal quotation marks omitted). In this case, permission to file a successive petition was granted to all Defendants based on the newly disclosed evidence of Sergio Hochman.

Defendants argue that the Ninth Circuit's grant of the successive petition, combined with the government's non-opposition, obviates the need for further review by this Court. Defendants posit that, "in certifying Vahe's successive 2255 motion, [the Ninth Circuit] has necessarily found that the allegations in said motion, if true, would establish by clear and convincing evidence that there was a 'reasonable probability that the withheld evidence would have altered

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

at least one juror's assessment' of Hochman's credibility." Dkt. 1350 at 6 (quoting *United States v. Kohring*, 637 F.3d 895, 906 (9th Cir. 2011)). That is not a persuasive interpretation of the statute, however, as the Supreme Court has held that, even if the circuit court certifies a successive motion, the District Court must then conduct an independent and thorough review of the evidence to determine if the facts do meet the statutory requirements. *Tyler v. Cain*, 533 U.S. 656, 660 n.3 (2001) ("But to survive dismissal in the district court, the applicant must actually 'sho[w]' that the claim satisfies the standard."); *see also In re Moore*, 830 F.3d 1268, 1271 (11th Cir. 2016) ("We rejected the assertion that the district court 'owes some deference to a court of appeals' prima facie finding that the requirements have been met."). Accordingly, although this Court accepts the Ninth Circuit's order as prima facie showing of a meritorious *Brady* claim, the Court is not relieved of its duty to independently analyze the facts on the record and apply the legal standard set forth in *Brady*.

Defendants also argue the Court should defer to the Government's non-opposition and confession of error, and grant the pending motions "forthwith." Dkt. 1350 at 12. As a threshold matter, the Court accepts as fact that Hochman was given the favors he described, and that those favor were not disclosed to the defense. However, the factual acceptance of misconduct does not imply the *Brady* standard has been satisfied. Defendants cite *Young v. United States*, 315 U.S. 257 (1942), in which the Supreme Court explained that "[t]he considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight . . . ." *Id.* at 258. However, Defendants omit the second half of the same sentence in *Young*, in which the Court explains, "but our judicial obligations compel us to examine independently the errors confessed." *Id.* Although the Government has declined to offer any opposition, "the proper administration of the criminal law cannot be merely left to the stipulations of the parties." *Id.* at 259; *see also United States v. Martinez*, 357 Fed. App'x 100, 101–02 (9th Cir. 2009) (explaining that a confession of error is entitled to great weight, but "confession of error is not binding on the court.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.    2:17-cv-09316-SVW                                    Date: August 10, 2020
            2:17-cv-09315-SVW
            2:13-cv-04928-SVW
            2:15-cv-04856-SVW
            2:89-cr-00190-SVW

Title    Vahe Andonian v. United States of America
         Nazareth Andonian v. United States of America
         Raul Vivas v. United States of America
         Juan Carlos Seresi v. United States of America
         USA v. Andonian et al

 

Defendants further argue the Court should observe executive deference, and treat the Government's non-opposition as conclusive, "particularly where the case is resolved on a non-precedential opinion." Dkt. 1358 at 14 (quoting *United States v. Martinez,* 357 Fed. App'x 100 (2009)). Generally, the executive branch (and prosecutors as members of the executive branch) is charged with "tak[ing] [c]are that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3. Accordingly, the Government's decision to forego prosecution of a defendant should be afforded great deference by the judiciary branch. *See United States v. Gonzalez,* 58 F.3d 459, 461 (9th Cir. 1995) ("We conclude that, even if the district court has discretion to deny a prosecutor's uncontested [Rule 48(a)] motion in exceptional circumstances, the district judge could not do so on the facts of this case."). However, no such deference is appropriate on habeas motions, which are intentionally and entirely entrusted to the judiciary. *See Boumediene v. Bush*, 553 U.S. 723 (2008) ("Surviving accounts of the ratification debates provide additional evidence that the Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme."). The Court in *Boumediene* went on to state that "[t]he clause protects the rights of the detained by means consistent with the essential design of the Constitution. It ensures that . . . the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Id.* at 745 (emphasis added). The Supreme Court also stated in *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004), that "the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions." Therefore, the separation of powers requires that the writ of habeas corpus be in the control of the judiciary and not be subject to prosecutorial will.

Even when the Government enters a non-opposition, the Court is required to independently examine the record and apply the law. *See, e.g., Ronell v. United States*, No. 1:06-cr-00066-LJO-1, 2014 WL 2504742 (E.D. Cal. June 3, 2014) (undertaking an independent analysis of the § 2255 motion despite the government's non-opposition); *Robles-Adame v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

*United States*, No. 3:16-cv-02850-GPC, 2017 WL 2465017 (S.D. Cal. June 7, 2017) (same). In this case, although the Government has provided limited briefing explaining its non-opposition, it has effectively abdicated its role in the adversarial process. After confessing error, the Government has demonstrated no familiarity with the underlying matter. As described above, the Government initially misrepresented to the Court that no trial transcript was available. After the transcript was produced (at the continued urging of the Court), the Government responded to the Court's order for additional briefing, but did nothing to demonstrate to the Court that it has diligently reviewed the record. As discussed below, in determining prejudice, the Court must "weigh the withheld evidence 'in the context of the entire record.'" *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (quoting *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir.2007)). Although the Government's position is afforded "great weight" with regard to the confession of error, the Court cannot extend such deference to the Government's opinion of the prejudice issue because the government has demonstrated a manifest disinterest in the trial record.

Although the Court defers to the Government on the factual issue, the Court's review of the legal issue is independent. This interpretation is consistent with other aspects of § 2255, which prescribes independent review by the judiciary, rather than deference to the executive or any other body, in several areas. 28 U.S.C. § 2255. First, § 2255 describes a detailed method for second or successive petitions to be filed, and this process cannot be waived by the government. *Nunez v. United States*, 96 F.3d 990, 991 (7th Cir. 1996) ("Even an explicit consent by the government to beginning the case in the district court would be ineffectual . . . ."); *see also Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (same). Second, as discussed above, district courts do not give deference to the court of appeals finding that a defendant has made prima facie showing of entitlement to relief under § 2255. *Tyler*, 533 U.S. at 660 n.3 (2001). Finally, as discussed above, even when the government fails to oppose a § 225 motion, the Court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

is obligated to undergo an "independent evaluation" of the facts and law. It is this Court's obligation to independently review the factual record, and apply the facts to the legal standard.

   b. **Consideration of the *Brady* Standard on a § 2255 Motion**

   In deciding the present § 2255 motions, the Court's consideration of the *Brady* standard is not substantively different than if Defendants had brought the claim under 42 U.S.C. § 1983. *See Sanchez v. United States*, 50 F.3d 1448 (9th Cir. 1995) (applying the *Brady* standard to defendant's § 2255 motion). The Court's duty in either case is to determine if Defendants' constitutional rights were violated such that they did not receive a fair trial. *C.f. Strickler v. Greene*, 527 U.S. 263, 264 (1999) ("The question [on habeas] is not whether the defendant would more likely than not have received a different verdict with the suppressed evidence, but whether in its absence he received a fair trial"); *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006) ("The animating purpose of *Brady* is to preserve the fairness of criminal trials."). In either case, it is Defendants' burden to show their constitutional rights were violated. *Strickler*, 527 U.S. at 291.

   "There are three components of a *Brady* violation: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009) (quoting *Strickler*, 527 U.S. at 281–82). Hochman failed to disclose impeachment evidence that could have been used to undermine his credibility at the criminal trial. This satisfies the first two components of the *Brady* claim: there is impeachment evidence that should have been but was not disclosed. "Having concluded that the first two components of [Defendants'] Brady claim have been met, we turn now to the final issue: whether the failure to disclose the *Brady* material was prejudicial." *Id.* at 911. It is Defendants' burden to show that the withheld evidence was "prejudicial." *Id.* at 910.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

"The touchstone of [the prejudice analysis] is whether admission of the suppressed evidence would have created a 'reasonable probability of a different result.'" *Id.* at 911 (quoting *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc)). Having concluded impeachment evidence remained undisclosed at the criminal trial, this Court must determine if Hochman's declaration contained evidence that was prejudicial "in the context of the entire record."[14] *Id.* at 913 (internal quotation marks omitted). As Defendants correctly note, "the Supreme Court has stressed, it has 'rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal.'" *Id.* at 911 (quoting *United States v. Bagley*, 473 U.S. 667, 680 (1985)). Thus, the Court examines whether, in the context of the trial record, Defendants have met their burden in establishing that the disclosure of Hochman's impeachment evidence would have created a "reasonable probability of a different result." *Price*, 566 F.3d at 911 (quoting *Jernigan*, 492 F.3d at 1053).

**IV.    Analysis of the Trial Record**

The trial record of this case is extensive. The criminal trial lasted over eight months, and the government's case-in-chief examined over sixty witnesses and included over 600 evidentiary exhibits. DCSF, Dkt. 1348-1 at 8. "The case was primarily based upon the testimony of 5 cooperating individuals and intercepted wire and oral communications which took place between November of 1988 and February of 1989." *Id.* Hochman was a defendant in the Koyemejian Conspiracy, and he pleaded guilty in exchange for his cooperation in the Koyomejian and Andonian cases, where he was an unindicted co-conspirator. *See supra* note 6. The same is true

---

[14] As the Ninth Circuit noted in *Price*, "[t]he prejudice analysis is often phrased in terms of 'materiality.'" *Price*, 566 F.3d at 911 n.12. "However, [t]he terms material and prejudicial are used interchangeably in *Brady* cases. Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.'" *Id.* (internal citation and quotation marks omitted).  Like the court in *Price,* for the purposes of this Order, the Court "use[s] the term 'prejudice' here so as to avoid the linguistic awkwardness that inheres in determining whether '*Brady* material' is or is not 'material.'" *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:17-cv-09316-SVW                    Date: August 10, 2020
           2:17-cv-09315-SVW
           2:13-cv-04928-SVW
           2:15-cv-04856-SVW
           2:89-cr-00190-SVW

Title      Vahe Andonian v. United States of America
           Nazareth Andonian v. United States of America
           Raul Vivas v. United States of America
           Juan Carlos Seresi v. United States of America
           USA v. Andonian et al

for Manouk Demirjian, another cooperating witness. Carlos Desoretz and Richard Ferris were
both named defendants in both conspiracies, and they both testified for the government in the
Andonian case. Finally, Mario Tankazyan was only a defendant in the Andonian case, and he
pleaded guilty before offering extensive cooperation at trial. *Id.* All five defendants gave
cooperating testimony in the Andonian case which substantially corroborated each other.
Although the parties characterize both "Hochman and Mario as the two principal witnesses
against the Andonians," (dkt. 1350 at 7), Mario provided the most expansive and relevant
testimony regarding the Andonian Conspiracy, as he was the direct link between ROAF and
ABI. *See* Dkt. 1358 at 7  ("Sergio Hochman never met with or spoke to either Andonian brother.
He was aware that Mario was an intermediary in purchasing gold from Andonian"). As discussed
further below, the Court has extensively reviewed the testimony of both Hochman and Mario to
determine what evidence Hochman contributed to the Andonian Conspiracy, and to what extent
it was corroborated or duplicated by Mario or other witnesses.

   a.   **Testimony of Vagram "Mario" Tankazyan, Richard Ferris, and Vahe
        Andonian**

        Vagram Mario Tankazyan, or "Mario" as he was referred to at the criminal trial, owned a
company called Rose Marie, Inc. in the Los Angeles jewelry mart. DCSF, Dkt. 1348-1 at 12.
Before meeting Vivas, "[t]his business bought scrap gold, refined same and resold the refined
gold back to other jewelry manufacturers in the jewelry mart." *Id.* "Mario met Vivas in 1986
when Rose Marie purchased Paolo, Inc. and a refinery it owned from Vivas. Mario also met
appellant Juan Carlos Seresi at the RAOF offices in early 1987." *Id.* (internal citations omitted).
"Beginning in April or May of 1987, Mario began to go to the RAOF offices and pick up cash,
which he would then use to purchase gold from gold brokers in the jewelry mart." *Id.* at 13.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:17-cv-09316-SVW                                    Date: August 10, 2020
            2:17-cv-09315-SVW
            2:13-cv-04928-SVW
            2:15-cv-04856-SVW
            2:89-cr-00190-SVW

Title    Vahe Andonian v. United States of America
         Nazareth Andonian v. United States of America
         Raul Vivas v. United States of America
         Juan Carlos Seresi v. United States of America
         USA v. Andonian et al

 

     Eventually, Mario met an employee of ABI, who referred Mario to the Andonian brothers for future gold purchases. *Id.* Mario developed a business relationship with the Andonian brothers, and eventually, as described above, the Andonians became the primary source of gold purchases for ROAF through Mario. *Id.* at 15. Mario was essential to the Andonian conspiracy because he would receive critical information from Seresi at ROAF about the delivery of millions of dollars in cash to Los Angeles, which could then be used to purchase gold through ABI. Unlike Hochman, who was based in New York City and never spoke to the Andonians, Mario was in constant contact with both members of ROAF and ABI. Hochman, Jun. 6, 1990 at 1775. Of all the cooperating defendants, Mario provided the bulk of the evidence relating to the Andonian conspiracy, testifying for eleven days in the criminal trial.

     The Court's review of the record reveals that Mario provided the most significant evidence relating to the Andonian Conspiracy. Initially, Mario explained the inner workings of ROAF and the relationships between Vivas, Hochman, Seresi, the Andonians, and the other co-conspirators. Mario, Jul. 2, 1990 at 4010–28. Mario fully explained how couriers would drop off bags of small-denomination cash to the ROAF office in New York, and how that cash would be counted and catalogued for delivery at ROAF. *Id.* at 4042–55. Mario explained the "La Mina" code that ROAF would use to track which couriers had delivered cash.[15] Mario even provided direct evidence of drugs—noting that he saw "white powder" on money being delivered to ROAF. *Id.* at 4059.

     Mario explained how both the physical gold delivery and the pool accounts worked, and the circular nature of the gold transactions between ROAF and A-Mark. *Id.* at 4067–80, 4109–

---

[15] As explained further below, there was no evidence the Andonians knew of or used the "La Mina" code, but the Andonians used a different code language when speaking with Mario about sending cash shipments.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.    2:17-cv-09316-SVW                    Date: August 10, 2020
            2:17-cv-09315-SVW
            2:13-cv-04928-SVW
            2:15-cv-04856-SVW
            2:89-cr-00190-SVW

Title    Vahe Andonian v. United States of America
         Nazareth Andonian v. United States of America
         Raul Vivas v. United States of America
         Juan Carlos Seresi v. United States of America
         USA v. Andonian et al

15. Mario described the "second London Fix,"[16] and how ROAF was buying gold above the second London Fix, but selling immediately afterward below the fix, generating a loss on every transaction. Mario, Jul. 17, 1990 at 5863–70. Despite incurring a loss on every transaction, Vivas was still able to pay a $4.00 premium on every ounce sold—split between Mario and the Andonians. Mario, Jul. 9, 1990 at 4642–50; Richard Ferris also testified extensively about the circular nature of the transactions between ROAF, Ronel, and A-Mark. DCSF, Dkt. 1348-1 at 26.

Mario testified that shipments of millions in cash would be sent to the Andonians from ROAF, and the Andonians would then order gold from A-Mark with that money. *See, e.g.*, Mario, Jul. 2, 1990 at 4109–13; Mario, Jul. 17, at 5888–99. Based on admitted records, the government argued that the Andonians' own ledger showed that the Andonians were paying people at ROAF in New York to box and ship the cash. USA Rebuttal, Nov. 29, 1990 at 77 19629–30. Mario testified to seeing Nazareth Andonian with Vivas on at least one occasion in the ROAF office. Mario, Jul. 5, 1990 at 4359.

Mario also testified how the Andonians agreed to receive huge volumes of cash, via Brinks and Loomis, from ROAF in New York at ABI's Los Angeles office. Mario, Jul. 5, 1990 at 4140–42. The Andonians set up the contract with Brinks and Loomis, and the Andonians told Mario where and how to ship the boxes. *Id.* Mario witnessed the Andonians counting millions of dollars in cash received from ROAF on a daily basis at ABI's Los Angeles office. Mario, Jul. 2, 1990 at 4146–50; Mario, Jul. 3, 1990 at 4213–20. The government introduced evidence of the

---

[16] "The second London fix is a benchmark used by gold traders for the purchase and sale of gold. Each morning, the price
per ounce of gold is quoted (second London fix). Assuming the price quoted is $400 per ounce, then gold brokers quote
their prices for both the purchase of gold and the sale of gold in relationship to the second London fix ($400)."
DCSF, Dkt. 1348-1 at 14 n.7.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.     2:17-cv-09316-SVW                    Date: August 10, 2020
             2:17-cv-09315-SVW
             2:13-cv-04928-SVW
             2:15-cv-04856-SVW
             2:89-cr-00190-SVW

Title        Vahe Andonian v. United States of America
             Nazareth Andonian v. United States of America
             Raul Vivas v. United States of America
             Juan Carlos Seresi v. United States of America
             USA v. Andonian et al

Andonians' ledgers that showed the Andonians were paying ROAF staff in New York to pack
and send the money—which ABI did not do with any other client. USA Rebuttal, Nov. 29, 1990
at 19630. "Bricks" of small denomination bills would be sent by ROAF to the Andonians, who
would then count the money with Mario using high-volume cash counting machines. Mario, Jul.
2, 1990 at 4054. Millions of dollars of small-denomination cash were received and counted by
the Andonians nearly every day. *Id.* at 4054–55. Mario thoroughly explained how the money
would get from ROAF to the Andonians and on to A-Mark. Mario described how Brinks or
Loomis would pick up and deliver boxes of cash to the Andonians on a daily basis. Mario, Jul. 3,
1990 4213–16.

        Mario also explained how the Andonians would disguise their discussions of shipping
cash by speaking in code. They would use the word "gram" to represent a thousand dollars and
the word "kilo" to represent a million dollars. *Id.* at 4220–21. So, instead of saying $450,000, the
Andonians would say they had 450 grams to ship. Instead of $500,000, the Andonians would say
"a half kilo," so as the make the shipments of cash appear to be shipments of jewelry. *Id.* When
shipping cash with Brinks or Loomis, the Andonians would use a similar code—marking the
boxes as "jewelry" rather than "cash" to avoid the suspicion of sending such large volumes of
cash so frequently. Mario, Jul. 2, 1990 at 4136–42. The Andonians would also split the
shipments between Brinks and Loomis, and have boxes sent to several different addresses, to
further disguise the volume of cash being sent. Mario, Jul. 5, 1990 at 4446–48. This practice was
substantiated by bills of lading and record books from Brinks and Loomis introduced into
evidence. USA Rebuttal, Nov. 29, 1990 at 19639–41 (Trial exhibits 182, 417). The prosecutor
argued that Vahe Andonian had no rational explanation for this practice. *Id.*

        Vahe admitted at trial that millions of dollars in cash were being sent from ROAF to ABI
on a daily basis, but testified that this was a common practice in the gold and jewelry industry.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:17-cv-09316-SVW                    Date: August 10, 2020
           2:17-cv-09315-SVW
           2:13-cv-04928-SVW
           2:15-cv-04856-SVW
           2:89-cr-00190-SVW

Title      Vahe Andonian v. United States of America
           Nazareth Andonian v. United States of America
           Raul Vivas v. United States of America
           Juan Carlos Seresi v. United States of America
           USA v. Andonian et al

Vahe, Sep. 6, 1990 at 11431–33; Vahe Closing, Nov. 9, 1990 at 18420. But even then, Vahe
admitted that he found the amount of money concerning—at least enough to seek the advice of
two separate lawyers. Dkt. 1350 at 3; Vahe Closing, Nov. 9, 1990 at 18525.[17] Vahe admitted that
the volume of money received from ROAF was a substantial change from ABI's previous
business: the Andonians went from doing roughly $100 million per year in gold transaction from
various sources to over $300 million almost entirely from ROAF. Dkt. 1350 at 2. Significantly,
the money laundering charges on which Defendants were convicted do not require any evidence
of narcotics. To be guilty of money laundering, the proceeds must be from "some form of
unlawful activity." 18 U.S.C. § 1956(a)(1)**.** By convicting the Defendants, the jury rejected
Vahe's contention that these transactions were legitimate gold sales. The specifics of the gold
transactions were corroborated in detail by Mario, Hochman, and Ferris.

Voice recordings were admitted into evidence that showed the Andonians using code to
discuss shipments of cash from ROAF to ABI. Mario, Jul. 5, 1990 at 4486–88. The bills of
lading from Brinks and Loomis confirmed that the Andonians were using a code to send cash
disguised as gold. *Id.* at 4446–50. Mario also testified, as supported by the records, that the boxes
of cash were constantly being sent to different addresses under different names using different
couriers. *Id.* at 4477. Vahe testified that this never happened, (Vahe, Sep. 5, 1990 at 11283), or
that it was a common practice in the jewelry industry. Vahe Closing, Nov. 9, 1990 at 18420–31.
By so testifying, Vahe Andonian put his credibility against the arguments of the government that
this massive flow of cash was suspicious. The jury clearly rejected Vahe's interpretation by
convicting on the money laundering charges.

---

[17] The Court does not address the advice of counsel defense raised by the Andonians at trial because it was fully
presented to and rejected by the jury. Hochman's testimony did not relate to this issue.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

Finally, Mario testified that in mid-1988, Hochman fled the ROAF office in New York because he thought he heard authorities outside the office—leaving $3 million unattended. Mario, Jul. 5, 1990 at 4344. Although Hochman testified to this event himself, Mario's account was consistent with Hochman's, and Mario's testimony was more relevant to the Andonians because of what happened following Hochman's flight. Mario testified that, after Hochman fled, Seresi informed Mario that whoever could retrieve the $3 million would get to take over the ROAF office in New York City. *Id.* at 4347. Mario described in detail the plan for Mario and Vahe Andonian to travel to New York to collect the money. *Id.* at 4354–58. Mario testified that he and Vahe even concocted an alibi whereby they would claim to be using the money to buy Italian chains in Los Angeles. *Id.*

However, Mario testified that he was too frightened to go, and at the last moment Tomas Iglesias accompanied Vahe Andonian to recover the New York money. *Id.* at 4362–65. Vahe agreed that he went to New York on the days in question, but he testified that he went to New York for a different purpose—to meet a business associate. DCSF, Dkt. 1348-1 at 33. But Mario testified that Vahe and Iglesias collected the money in New York and sent it back to ABI in Los Angeles uncounted via Loomis. Mario, Jul. 5, 1990 at 4362–65. Once the money arrived in Los Angeles, Mario, Vahe, and Iglesias all counted the money together. *Id.* at 4369–76. After the "New York Incident," Mario continued to work with ROAF as a bookkeeper, but the purchasing of gold shifted substantially to Seresi. DCSF, Dkt. 1348-1 at 17–19. Mario testified as to every aspect of the ROAF/ABI operation until the conspiracy ended in 1989.

### b. Testimony of Sergio Hochman

Sergio Hochman was Argentinian by birth, and he met Vivas in Uruguay in 1983 through their mutual work in the gold refining business. Hochman, May 31, 1990 at 202. According to Hochman, the scheme for the Koyomejian Conspiracy was devised between Vivas and Hochman

---

CV-90 (03/15)  Civil Minutes – General  Page **24** of 32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

mid-year of 1985, and they both traveled to Miami to meet with Ronel Refining shortly thereafter. Hochman, Jun. 1, 1990 at 28–35. Hochman left Uruguay to live in the United States on July 21, 1986. *Id.* at 91. Hochman worked for ROAF in the Los Angeles jewelry mart from 1986 until 1988, when he took over the ROAF office in New York City. DCSF, Dkt. 1348-1 at 9–10. Hochman was arrested for his role in both the Andonian and Koyomejian Conspiracies in February of 1989, and remained in custody during the Andonian trial. Hochman, Jun. 6, 1990 at 116. Hochman entered a guilty plea in the Koyomejian Conspiracy, and was an unindicted co-conspirator in the Andonian Conspiracy. *See supra* note 6.

Hochman testified for seven days during the Andonian trial. At trial, Hochman testified to and was cross-examined on the deal he received in exchange for his cooperation. Hochman, Jun. 1, 1990 at 1487–89 (discussing Hochman's plea deal in-depth); Hochman, Jun. 7, 1990 at 2001–06 (on cross-examination). However, as discussed above, Hochman never mentioned the four personal benefits that formed the basis of his later declaration. The Court has already concluded that this presents impeachment evidence, and that it should have been disclosed to the defense.

Before negotiating a plea bargain, Hochman was facing potential life in prison; after his cooperation, the maximum sentence he could receive was twenty years. Hochman, Jun. 1, 1990 at 1487–89. Because Hochman disclosed the more significant benefits of his cooperation, disclosure of the four smaller personal benefits might not have further impeached his credibility. More importantly, the is no indication that Hochman's testimony or the government's arguments regarding the Andonian Conspiracy would have been materially different had Hochman disclosed the personal benefits. There was no argument, for example, that Hochman had not previously cooperated in both the Andonian and Koyomejian Conspiracy cases, or that he was not part of the prior conspiracy. *C.f. United States v. Obagi*, No. 18-50170, 2020 WL 4033849 (9th Cir. July 17, 2020) (finding a *Brady* violation when the government failed to disclose, until

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

closing argument, that a key cooperating witness had previously cooperated with the government in a similar but separate case).[18]

Nonetheless, the Court assumes *arguendo* that the newly disclosed evidence would have impeached Hochman to the point of incredibility. In discussing Hochman's testimony, the Court discounts all testimony from Hochman that is not corroborated by another witness or by documentary evidence. As explained below, however, "[e]ven if [the witness's] credibility as a witness had been totally destroyed, we are confident beyond doubt that the jury would have found [Defendants] guilty, based on the overwhelming evidence presented by the government . . . ." *United States v. Olsen*, 704 F.3d 1172, 1185 (9th Cir. 2013).

Large portions of Hochman's testimony related to the Koyomejian Conspiracy, and, as described above, were introduced against Vivas and Seresi as 404(b) evidence. In the Koyomejian conspiracy, Hochman testified how money was collected from street-level couriers, packed into boxes, and sent to Los Angeles to purchase gold. Regarding the Andonian Conspiracy, however, this process was more thoroughly examined by Mario. Hochman also testified about the "La Mina" code, whereby ROAF would keep track of which courier dropped off cash at the ROAF office in New York. Hochman, Jun. 1, 1990 at 1494–99. However, Mario

---

[18] In *Obagi*, one of the government's key cooperating witness, Halime "Holly" Saad, falsely testified that she had never received a deal in exchange for her testimony. *Obagi*, No. 18-50170, 2020 WL 4033849, at *2. "[T]he government relied heavily on Saad," and emphasized that her lack of immunity made her corroboration of other, less-credible witnesses more believable. *Id.* "Unfortunately, one of prosecution's key tenets during closing—that the jurors could trust the culpable cooperators because they could trust Saad as an independent corroborating witness— was false." *Id.* at, *3. The fact that Saad had received immunity in a separate mortgage fraud investigation was not disclosed until closing arguments had begun. *Id.* Despite the trial court's best efforts to cure the prejudice, the Ninth Circuit found reversible error. *Id.* The current Andonian case presents a materially distinguishable scenario. Here, there was no question that Hochman had received substantial benefits in exchange for his cooperation in both the Andonian and Koyomejian Conspiracies. The government did not argue that Hochman was unimpeached, but emphasized that his testimony was corroborated by documentary evidence and other cooperating witnesses.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

also testified extensively to the details of the La Mina code. Mario, Jul. 2, 1990 at 4042–53; Mario, Jul. 3, 1990 at 4201–07. Further, the La Mina code was never known or used by the Andonians. Dkt. 1358 at 7–8.

Defendants argue that Hochman's testimony was essential because it created the link between the drug conspiracy with the Koyomejians and the money laundering conspiracy with the Andonians. However, Hochman's testimony regarding drugs was minimal. Hochman testified that, although he never saw drugs, his understanding was that ROAF was collecting cash from drug sales. Hochman, Jun. 1, 1990 at 1476. Defendants' theory is that "Hochman's testimony hurt the Andonians not so much by what he said, but rather what he didn't say." Dkt. 1358 at 7. However, as described above, the jury rejected all charges related to drugs. The Ninth Circuit affirmed the Trial Court's handling of this 404(b) evidence, and it is clear Hochman's testimony regarding drugs did not influence Defendants' conviction on the money laundering charges. Although evidence regarding the La Mina code or Koyomejian Conspiracy evidence was certainly relevant, based on the record, it did not play a significant role in the Andonian Conspiracy convictions. Evidence that merely bolsters other witnesses, or that is rejected by the jury, is generally not considered prejudicial. *See Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) ("But even if the jury disbelieved [the witness] entirely . . . there still is no 'reasonable likelihood' that the false testimony could have affected the judgment of the jury.'") (quoting *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008)).

Hochman also testified at length about the circular nature of the gold transactions, including describing the operation of the cash delivery, gold shipments, and pool accounts. Hochman, Jun. 6, 1990 at 1721–40. As described above, however, these elements were explained in greater detail by Mario Tankazyan and Richard Ferris. Hochman's job in the Andonian conspiracy was predominantly concerned with collecting and shipping cash from New York City to Mario and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:17-cv-09316-SVW                           Date: August 10, 2020
           2:17-cv-09315-SVW
           2:13-cv-04928-SVW
           2:15-cv-04856-SVW
           2:89-cr-00190-SVW

Title      Vahe Andonian v. United States of America
           Nazareth Andonian v. United States of America
           Raul Vivas v. United States of America
           Juan Carlos Seresi v. United States of America
           USA v. Andonian et al

the Andonians in Los Angeles. But all of the details of those shipments were also provided by the recipient—Mario Tankazyan.

In fact, Hochman testified that he never personally spoke to the Andonians. Hochman, Jun. 6, 1990 at 1175; Hochman, Jun. 7, 1990 at 1943. In their briefs to the Ninth Circuit, the Andonians emphasized the minimal connection they had with Hochman. *See* Dkt. 1348-2 at 9–11. The Andonians argued that most of Hochman's testimony was unrelated to the Andonian Conspiracy, and should not have been introduced at all. *Id.* at 22–24. As discussed above, the Ninth Circuit affirmed the Trial Court's handling of the 404(b) evidence. *See Andonian*, 29 F.3d 634 (Mem.), at *6.

Other elements of the conspiracy that Hochman discussed were corroborated by documentary evidence. For example, Hochman discussed the bills of lading from Brinks and Loomis, but these were supported through documents introduced elsewhere. Hochman, Jun. 7, 1190 at 1959–62 (Exhibit 104(c)). Similarly, flight records, Loomis records, and Hochman's financial and travel records confirmed the "New York Incident," where Hochman left roughly $3 million unattended in the ROAF New York Office. United States Closing, Nov. 7, 1990 at 18173–82. Hochman was not needed to establish the details of the gold transactions either, as the volume of cash and gold exchanged between ROAF, ABI, and A-Mark, was available through the records of ABI, A-Mark, Brinks, and Loomis. *See* Nazareth Andonian Closing Argument, Nov. 16, 1990 at 18767–80; United States Rebuttal, Nov. 29, 1990 at 19675–78. All of these records could be explained by Mario and Ferris, who had a substantially larger role in the gold sales. The government also introduced numerous audio recording of Defendants discussing shipments of cash from ROAF in New York to ABI in Los Angeles. United States Rebuttal, Nov. 29, 1990 at 19628–35.

Hochman provided seven days of testimony, and his testimony was certainly beneficial to the government. "Impeachment evidence is especially likely to be material when it impugns the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

testimony of a witness who is *critical* to the prosecution's case." *Kohring*, 637 F.3d at 905 (emphasis added). Although helpful, the Court's careful review of the record finds that Hochman was not critical to the government's case. Hochman testified extensively to the Koyomejian Conspiracy, but that evidence was never offered against the Andonians, and the Ninth Circuit affirmed the Trial Court's management of the 404(b) evidence with regard to all Defendants. Any evidence of drugs was rejected by the jury, and was not an element of the money laundering charges under which Defendants were convicted. The "La Mina" code was never used by the Andonians, and Mario was able to explain the necessary elements of the code during his examination. Hochman also provided details of the shipments of cash from ROAF to ABI, but again that evidence was provided in greater detail by Mario and substantiated by documentary evidence. Defendants repeatedly emphasized that Hochman had no direct contact with the Andonians, and his role in the Andonian Conspiracy, although important, was mostly cabined to New York City.

The operations of the gold trading, both physically and through pool accounts, was covered in detail by Mario and Ferris, and was again supported with substantial documentation. Notably, Vahe Andonian offered contrary explanations for the evidence described above, but the jury rejected his testimony by finding Defendants guilty. All of the relevant evidence provided by Hochman that related to the Andonian Conspiracy was confirmed independent of Hochman, either thorough documentary evidence or other corroborating witnesses.

**c. Conclusions Based on the Trial Record**

The Court has focused its attention on the testimony of Mario, Hochman, Ferris, and Vahe Andonian, but the evidence in this case is significantly greater than the testimony of these four witnesses. As discussed above, the government's case alone consisted of over 60 witness and over 600 pieces of evidence, many of which included audio recordings and detailed records from the Andonians, Vivas, Seresi, Hochman, and Mario. Aside from Mario and Hochman, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:17-cv-09316-SVW                 Date: August 10, 2020
           2:17-cv-09315-SVW
           2:13-cv-04928-SVW
           2:15-cv-04856-SVW
           2:89-cr-00190-SVW

Title       Vahe Andonian v. United States of America
           Nazareth Andonian v. United States of America
           Raul Vivas v. United States of America
           Juan Carlos Seresi v. United States of America
           USA v. Andonian et al

government produced three other cooperating witnesses, who all corroborated the operations of the Andonian Conspiracy.

After a thorough examination of the record, the Court has not found any material evidence introduced by Hochman that was not substantially corroborated by documentary evidence or other witnesses. Hochman was a helpful witness, but it is not enough that the government's case would be slightly weaker without Hochman: "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Olsen*, 704 F.3d at 1184 (quoting *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir.2005)). Even without Hochman, the evidence in this case was overwhelming, and the Court is convinced the trial resulted "in a verdict worthy of confidence." *Id.* at 1184 (quoting *Strickler*, 527 U.S. at 289–90). "Upon a careful review of the record, we conclude that there is no reasonable probability that the verdict would have been different if the favorable evidence had been disclosed." *Id.* at 1185.

**V.    Conclusion**

Based on the Order above, the Court concludes the Defendants have not met their burden to show that a *Brady* violation has occurred. Because they were the only parties that provided briefs (although without any evidentiary analysis), the Court has focused on the evidence that related to the Andonian brothers. But the Court has spent hundreds of hours considering the record with regard to the entire Andonian Conspiracy. All Defendants were convicted on money laundering and conspiracy charges under the Andonian Conspiracy, and the discussion above demonstrates that overwhelming evidence of the scheme was presented at trial. As noted above, every Defendant, each represented by counsel, was the afforded the opportunity to provide additional briefing to this Court, and all declined. Dkt. 1370.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:17-cv-09316-SVW | Date: August 10, 2020 |
| | 2:17-cv-09315-SVW | |
| | 2:13-cv-04928-SVW | |
| | 2:15-cv-04856-SVW | |
| | 2:89-cr-00190-SVW | |

| | |
|---|---|
| Title | Vahe Andonian v. United States of America |
| | Nazareth Andonian v. United States of America |
| | Raul Vivas v. United States of America |
| | Juan Carlos Seresi v. United States of America |
| | USA v. Andonian et al |

Although this Order has not discussed the evidence against either Vivas or Seresi in as much detail, the Court's examination of the record compels the same result among all Defendants. The evidence the Court has reviewed shows that all Defendants were intimately involved in nearly every aspect of the Andonian Conspiracy. The record clearly shows that Vivas was at the head of the Andonian Conspiracy. Vivas was responsible for orchestrating the money laundering scheme, and gave orders to Mario, Hochman, Seresi, the Andonians, and many other members of the conspiracy. This was supported through multiple witnesses unrelated to Hochman and a deluge of documentary evidence. Further, the record establishes that Seresi was an essential player in the Andonian Conspiracy. Specifically, he was key employee of ROAF, and, taking direction from Vivas, transmitted crucial information to the other conspirators in the scheme regarding the purchase of gold, which Mario testified to at length. Seresi was also described as running J.C. Jewelers, the successor company to ROAF once Vivas fled the United States. DCSF, 1348-1 at 18.

For these reasons, all Defendants' motions to vacate or correct their sentences are DENIED.

IT IS SO ORDERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.　2:17-cv-09316-SVW　　　　　　　　Date: August 10, 2020
　　　　　2:17-cv-09315-SVW
　　　　　2:13-cv-04928-SVW
　　　　　2:15-cv-04856-SVW
　　　　　2:89-cr-00190-SVW

Title　　Vahe Andonian v. United States of America
　　　　Nazareth Andonian v. United States of America
　　　　Raul Vivas v. United States of America
　　　　Juan Carlos Seresi v. United States of America
　　　　USA v. Andonian et al

　　　　　　　　　　　　　　　　　　　　　　　　　　　：

**Initials of Preparer**